# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 26, 2011

## STATE OF TENNESSEE v. BENJAMIN WILLIAM RIFFEY, ALIAS

**Appeal from the Criminal Court for Knox County**
No. 77360B    Jon Kerry Blackwood, Senior Judge

---

**No. E2011-00641-CCA-R3-CD - Filed March 9, 2012**

---

In February 2005, the Defendant, Benjamin William Riffey, alias, pled guilty to facilitation to commit aggravated robbery. He was sentenced as a Range I, standard offender to six years and was placed on probation. Subsequently, the Defendant was transferred to enhanced probation. On February 22, 2011, a violation of probation warrant was filed, the third against the Defendant. Following a hearing, the trial court revoked the Defendant's sentence of probation and ordered that he serve the remainder of his six-year sentence in the Department of Correction. In this appeal, the Defendant contends that the trial court erred by revoking his probation. After a review of the record, we conclude that the trial court did not abuse its discretion and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Cameron D. Bell, Knoxville, Tennessee, for the appellant, Benjamin William Riffey, alias.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

On February 2, 2005, the Defendant pled guilty to facilitation to commit aggravated robbery, a Class C felony. See Tenn. Code Ann. §§ 39-11-403, -13-402. He received a six-year sentence as a Range I, standard offender and was placed on probation. In July 2007, a violation of probation warrant was filed, which was later amended. The Defendant's

probation was revoked in February 2008, and he was returned to probation and ordered to serve an additional year on probation. A second violation warrant was issued on June 19, 2008, which was thereafter amended twice. Ultimately, the petition for revocation was dismissed. On August 14, 2009, the Defendant was transferred to enhanced probation. On February 22, 2011, a third violation of probation warrant was filed.

The first violation warrant was issued on July 27, 2007, alleging that the Defendant had violated the rules of his probation by being arrested for theft of a laptop valued at $1,200 and by not paying supervision fees and court costs as required. The warrant was later amended to include the additional violation of failure to perform community service work as ordered. Following a hearing, the trial court revoked the Defendant's probation on February 28, 2008, finding that "the [D]efendant has been guilty of violating the laws of this State, and has otherwise violated the conditions of his probation." As a result of the revocation, the Defendant was "placed back on [s]tate [p]robation for one additional year[.]"

The Defendant was again charged with violating the conditions of his probation. On June 19, 2008, the trial court issued a second violation warrant, wherein it was alleged that the Defendant admitted to using marijuana on May 22, 2008. The warrant was amended in August 2008, to include additional violations: that the Defendant had changed residences without notifying his probation officer; that the Defendant had missed his "scheduled A&D appointment with CAPP"; that the Defendant refused to pay his probation fees; and that the Defendant had not performed his community service work as required. This warrant was amended a second time in December 2008. In addition to restating that the Defendant had failed to pay his probation fees and perform his required community work, the Defendant's probation officer averred that the Defendant "was argumentative and belligerent with his probation officer on 10-22-08." The trial court dismissed the petition for revocation following a hearing on April 9, 2009. Thereafter, his supervision was briefly transferred to Indiana but was quickly returned to Knoxville after he came back to Tennessee.

On August 14, 2009, the trial court transferred the Defendant from regular probation to enhanced probation, where he was then supervised by Lisa Mooneyham with the Board of Probation and Parole. The trial court issued a third violation warrant on February 22, 2011, based upon allegations by Ms. Mooneyham (1) that the Defendant was arrested on February 18, 2011, for leaving the scene of accident, driving under the influence, driving on a suspended license, and violating an order of protection; (2) that the Defendant violated his curfew and was under the influence of alcohol on the evening of his arrest; (3) that the Defendant was in arrearage for supervision fees; (4) that he "had not provided verification that costs [had] been paid"; and (5) that he was in arrearage for required community service work. A hearing on the warrant was held on March 11, 2011.

Ms. Mooneyham testified that, after the Defendant was "administratively moved" to enhanced probation, she supervised the Defendant. According to Ms. Mooneyham, her former supervisor "felt like that [the Defendant] was considered more of a high risk on -- for regular probation." She stated that, at that time of his transfer, the Defendant was "very difficult to deal with" and he was not "maintaining his mental health treatment[.]" During her supervision of the Defendant, the Defendant married and had a child. The couple later divorced, and "an order of protection was in place."

Ms. Mooneyham testified that the Defendant initially did "fairly well" on enhanced probation and dealt with things in an appropriate manner. She explained that the Defendant had bipolar disorder. According to Ms. Mooneyham, the Defendant was maintaining his mental health and handling "his estranged wife . . . appropriately." She testified that, in the beginning, the Defendant contacted her several times a day, so they could "work through any issues he had." He reported to her as required and obeyed his curfew. Although he worked at a moving company, his hours had been reduced, and he "was job searching." He was struggling financially and, because of his mental health issues, Ms. Mooneyham was able to assist the Defendant with getting funds from the Helen Ross McNabb center to pay his rent.

She testified about the allegations in the February 22, 2011 warrant—the Defendant's arrest for new charges and being behind in his required community service work and payment of his supervision fees. Ms. Mooneyham's probation violation report was entered into evidence without objection.

Following the Defendant's arrest on February 18, 2011, the Defendant posted bond and then phoned Ms. Mooneyham to inform her of his arrest. The Defendant did as she instructed and turned himself in for the probation violation. Ms. Mooneyham confirmed that the Defendant was not allowed to consume alcohol while on probation and was in violation of his curfew on the evening he was arrested. Acknowledging that he had been charged with violating the protection order on the night of his arrest, she opined that the Defendant "felt like he could be more around her" after the divorce was final, despite the fact that they had "a very volatile relationship anyway." When asked about the alleged violation of the order of protection, Ms. Mooneyham responded, "Well, I was under the impression that he resolved that when the divorce was final." She thought that the order of protection had been lifted and opined that the Defendant likely thought the same. Ms. Mooneyham asked the Defendant why this incident had happened, and the Defendant responded that he was having a panic attack and apologized for not calling her. At the time of his arrest, he was no longer frequently calling Ms. Mooneyham to discuss his problems; those types of phone calls ceased when the Defendant got divorced.

As for his community service work, Ms. Mooneyham stated that the Defendant had tried to catch up on it when he was placed on enhanced probation, but he had again fallen behind in performing the required hours. Also, because his hours at the moving company were not very regular, he had fallen behind in paying his supervision fees. Ms. Mooneyham testified that she told the Defendant he would have "to catch up with things that he was behind on[.]"

Ms. Mooneyham stated that, while the Defendant's behavior was troubling, she did not consider him "a lost cause" and thought that this incident "was out of character for him[,]" that he "made a very foolish mistake[.]" She characterized the Defendant as a good father to his daughter, helping to support and raise her. Since the Defendant had been placed under her supervision, she had "seen an improvement in his ability to become a contributing member to society[.]" According to Ms. Mooneyham, the Defendant's mother and sister were very supportive of the Defendant's efforts to rehabilitate himself. Despite these encouraging words, she was "very concerned" by the Defendant's behavior.

Ms. Mooneyham testified that the February 18, 2011 charges against the Defendant were still pending at the time of the hearing. The affidavit of complaints for leaving the scene of accident, driving on a suspended license, and driving under the influence, were attached to Ms. Mooneyham's probation violation report. According to Ms. Mooneyham, the Defendant's probation was set to expire in 2012.

The Defendant testified that he benefitted greatly from Ms. Mooneyham's supervision, as she was the only one who "could keep [him] under control." According to the Defendant, he had never been placed on probation prior to this offense. The Defendant believed he could succeed on enhanced probation if allowed another chance, stating that he wanted to do so for his nine-month-old daughter, whom he cared for four days a week. He asserted that he would "be able to stay out of any further trouble[.]"

When asked about his employment, the Defendant relayed that he was employed with a moving company for two months, which he thought was going to provide him with regular work. However, once the weather turned bad, his hours were cut. He tried to get hired by another moving company, "but it kind of dwindled away also." The Defendant claimed his father could get him a full-time job at Krispy Kreme if he was reinstated to probation.

The Defendant acknowledged that he had been on probation since 2005 and was "behind a lot" in performing his community service work and was not up-to-date on paying his supervision fees. He claimed that his supervision fees were $45 a month but that those could be lowered by going to the Career Center, which he did sometimes. He recalled being told by the court in December 2008 that he was "extremely behind on [his] community

service" and court costs. According to the Defendant, in April 2009, his mother paid $1,700 towards his court costs, so he could go live with her in Indiana. He admitted that his supervision fees were still in arrearage in the amount of $620, paying only $100 since December 2008, but claimed his family could pay any arrearage if needed. He believed his courts costs had been paid in full. The Defendant further acknowledged that his community service work was still not completed; he estimated that he had done approximately four days of community service work since December 2008 and that he had approximately 14 days left to do. When asked why he had not completed the work, the Defendant replied, "My reasons probably aren't the best reasons." He claimed that he was busy seeking employment to support himself and his daughter and that transportation was a problem. At one point, he tried living with his mother in Indiana but later returned to Knoxville to attend Pellissippi State Community College. The Defendant testified that he did not know why his license had been suspended prior to his arrest for that charge.

The Defendant's sister, Jamie Riffey, testified that she spoke with the Defendant daily and visited him often when she had a valid driver's license. If her schedule had permitted, she would have driven him to do community service work. She believed that the birth of the Defendant's daughter had "completely changed him. He doesn't want to get in trouble." She considered him to be a good father and did not think he had any violent tendencies. She stated that the Defendant had improved over the years while on enhanced probation, opining that the Defendant "sincerely desire[d] to -- to successfully complete his probation[.]"

Following the completion of testimony, the trial court found by a preponderance of the evidence that the Defendant had failed to pay his supervision fees, failed to perform his required community service work, and had committed new offenses. The trial court revoked the Defendant's probation and ordered him to serve the remainder of his six-year sentence in the Department of Correction. This appeal followed.

## ANALYSIS

The Defendant contends that the trial court abused its discretion by revoking his probation and ordering him to serve the remainder of his sentence in the Department of Correction. Specifically, he contends that the State failed to establish that he violated the law by a preponderance of the evidence, that there was no evidence that his failure to pay was willful or that he failed to make sufficient bona fide efforts to acquire the resources to pay, and that he was not apprised of a deadline for performance of his community service work. The State responds that there is ample evidence in the record to support the trial court's findings.

A trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of release. Tenn. Code Ann. § 40-35-311(e). The decision to revoke probation is in the sound discretion of the trial judge. State v. Kendrick, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005); State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). The judgment of the trial court to revoke probation will be upheld on appeal unless there has been an abuse of discretion. State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). To find an abuse of discretion in a probation revocation case, the record must be devoid of any substantial evidence that would support the trial court's decision that a violation of the conditions of probation occurred. Id.; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). Such a finding "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

A trial court is not required to find that a violation of probation occurred beyond a reasonable doubt. Stamps v. State, 614 S.W.2d 71, 73 (Tenn. Crim. App. 1980). The evidence need only show that the court has exercised conscientious judgment in making the decision and has not acted arbitrarily. Id. In reviewing the trial court's finding, it is our obligation to examine the record and determine whether the trial court has exercised a conscientious judgment rather than an arbitrary one. Mitchell, 810 S.W.2d at 735.

The Defendant's primary argument is that the State failed to establish by a preponderance of the evidence that he committed new offenses. It is generally recognized that in order to prevail in a revocation proceeding based upon allegations of criminal misconduct, the State must show by a preponderance of the evidence that the defendant violated the law. See State v. Michael Harlan Byrd, No. 01C01-9609-CC-00411, 1998 WL 216859, at *7 (Tenn. Crim. App. May 1, 1998). The State need not show a conviction for the new offense, but it should show by a preponderance of the evidence that the defendant violated the law. See State v. Andrew B. Edwards, No. W1999-01095-CCA-R3-CD, 2000 WL 705309, at *3 (Tenn. Crim. App. May 26, 2000), perm. app. dismissed, (Tenn. Sept. 11, 2000).

A new arrest and pending charges are proper grounds on which a trial court can revoke a defendant's probation provided that the State establishes sufficient grounds, generally by "produc[ing] evidence in the usual form of testimony," that the defendant committed another offense while on probation. See State v. Paul Williams, aka Paul Williams El, No. W2010-00598-CCA-R3-CD, 2011 WL 1457741, at *5 (Tenn. Crim. App. Apr. 15, 2011) (quoting Harkins, 811 S.W.2d at 83 n.3), perm. app. denied, (Tenn. Aug. 24, 2011). Arrest warrants alone, with supporting affidavits, may be sufficient to support a

revocation finding.  See State v. John Edward Winn, Jr., No. M2009-00094-CCA-R3-CD, 2010 WL 2516855, at *3 (Tenn. Crim. App. June 22, 2010) (e.g., State v. Frederick Neblett, No. 01C01-9805-CR-00232, 1999 WL 142069, at *3 (Tenn. Crim. App. Mar. 17, 1999) (trial court properly relied on facsimile copy of arrest warrant which was reliable hearsay and where good cause existed to allow its introduction); State v. Jerry Dale Whitehead, No. 86-220-III, 1987 WL 7984, at *2 (Tenn. Crim. App. Mar. 17, 1987) (arrest report admissible in determining probation revocation)).  The terms of the violation warrant put the Defendant on notice that the State would assert the new charges as part of its case for revocation. See id. (citing Whitehead, 1987 WL 7984, at *2).

The State argues that the affidavits of complaint attached to Ms. Mooneyham's probation violation report constitute proper evidence upon which to base the revocation. We agree. Ms. Mooneyham testified that the Defendant called to inform her of his arrest and she received a copy of the arrest report. Ms. Mooneyham asked the Defendant why this incident had happened, and the Defendant responded that he was having a panic attack and apologized for not calling her.  A copy of her violation report, which included the affidavits of complaints, was entered into evidence. While the officer who executed the affidavits did not testify at the revocation hearing, the Defendant did not object to the introduction of this evidence as an exhibit to Ms. Mooneyham's testimony. Thus, the trial court could rely upon the matters set forth in the affidavits.  See State v. Mark Crites, No. 01C01-9711-CR-00512, 1999 WL 61053, at *3 (Tenn. Crim. App. Feb. 9, 1999); State v. Charles Wayne Richardson, No. 03C01-9503-CR-00065, 1995 WL 464234, at *3  (Tenn. Crim. App. Aug. 7, 1995) (approving the reliance upon information set forth in an arrest warrant and affidavit to support a revocation).

In the affidavits of complaint, Officer Wesley Chad Coleman stated that he was dispatched to an automobile "crash with injury" at approximately 11:30 p.m. on February 17, 2011. Upon arrival at the scene, Officer Coleman observed a row of mailboxes that had been knocked down, but no vehicle was present. Officer Coleman followed the "fluid trail" from the scene to an automobile parked in front of a residence; he then observed footprints leading from the vehicle inside the residence.  He proceeded to the house and saw the Defendant through a glass door "laughing and holding an unopened bottle of Corona beer."  Upon speaking to the Defendant, Officer Coleman learned that the car belonged to the Defendant's ex-wife. The Defendant initially denied driving the car, but Officer Coleman spoke with the Defendant's ex-wife, who advised him that the Defendant had just returned from driving her vehicle. The Defendant then admitted to being the driver of the car when it was involved in the accident, and the keys were found in his pocket.  Officer Coleman noted that the Defendant smelled of alcohol, he had "blood shot/glassy eyes," his speech was slurred, he was unsteady on his feet, and he admitted to consuming alcohol.  According to Officer Coleman, the Defendant performed poorly on a field sobriety test.  The results of a blood

alcohol test were still pending at the time he prepared the affidavits. Officer Coleman also noted that a records check revealed that the Defendant's driver's license was suspended for two counts of "failure to satisfy citations."

This was sufficient evidence to establish by a preponderance of the evidence that the Defendant had committed new offenses. Therefore, we cannot conclude that the trial court abused its discretion in revoking the Defendant's probation.

As a secondary matter, the State argues that, even if the trial court erred by considering evidence of the Defendant's pending charges, there was other adequate evidence supporting revocation as the trial court also found that the Defendant failed to pay his supervision fees and failed to perform his required community service work. The Defendant argues that the record does not support a finding that he violated the terms of his probation on these grounds. Specifically, he contends that (1) he only had costs, as opposed to restitution, outstanding, and one cannot be imprisoned for default of costs; (2) even if he owed restitution, the court was required to find that his failure to pay was willful or that he failed to make sufficient bona fide efforts to acquire the resources to pay; and (3) he was not apprised "that there was a deadline for him to complete a certain amount of community service hours by any date other than the natural expiration of his term of probation."

Regarding his failure to pay his fees, the Defendant himself testified at the probation revocation hearing that he had paid his court costs in full and only had supervision fees remaining; no mention was ever made of any restitution owed. Ms. Mooneyham testified that she informed the Defendant prior to filing the warrant that he was behind on some of his fees. When the defendant's violation of probation is based on failure to pay restitution or fines, the trial court must determine the reasons behind the failure to pay. State v. Dye, 715 S.W.2d 36, 40 (Tenn. 1986); Massey v. State, 929 S.W.2d 399, 402 (Tenn. Crim. App. 1996) (citing Bearden v. Georgia, 461 U.S. 660(1983)). If the nonpayment is due to willful refusal to pay or failure to make sufficient bona fide efforts to obtain the means to pay, then probation may be revoked. Dye, 715 S.W.2d at 40. If, on the other hand, the nonpayment stems from the probationer's inability to pay, it may not form the basis for imprisonment unless alternative measures other than incarceration are inadequate to meet the State's needs in punishment and deterrence. Id. Here, the record does not reflect that the trial court made the appropriate determination that the Defendant's nonpayment was willful or that he failed to make bona fide efforts to obtain the means to pay, as is required.

Other panels of this court have reasoned that implicit findings were sufficient to fulfill the requirement under Dye and Bearden. See State v. Roderick Dean Hughes, E2009-00649-CCA-R3-CD, 2009 WL 3787251, at *4 (Tenn. Crim. App. Nov. 12, 2009), State v. Bernita Hogan, M2002-00808-CCA-R3-CD, 2003 WL 1787312, at *4-5 (Tenn. Crim. App. Apr. 4,

2003), perm. app. denied, (Tenn. Sept. 8, 2003). The Defendant provided that his supervision fees were $45 a month, but he stated that the fee could be lowered by going to the Career Center, which he did sometimes. The Defendant admitted that his supervision fees were still in arrearage in the amount of $620, having paid only $100 since December 2008. At the time of the hearing, these fees had not been paid, but the Defendant claimed his family could pay them for him, if needed. Prior to being transferred to enhanced probation, the Defendant had twice been informed through violation warrants of his failure to pay his supervision fees. However, there was some indication at the revocation hearing that the Defendant's failure to pay his fees was due to his inability to do so. Ms. Mooneyham testified that, although the Defendant worked at a moving company, his hours had been reduced. She stated that he "was job searching[,]" but he was struggling financially. Ms. Mooneyham even assisted the Defendant in getting funds to pay his rent.

On the record before us, the findings of the trial court do not rise to the level of the implicit findings in Hughes and Hogan. We must conclude that the court erred in revoking the Defendant's probation on this ground without making adequate findings to support its ruling. See State v. Raymond Bradley, Jr., No. M2010-02508-CCA-R3-CD, 2011 WL 2682183, at *4 (Tenn. Crim. App. July 11, 2011) (citing State v. Shane Thomas Cox, E2009-00628-CCA-R3-CD, 2010 WL 98885, at *3 (Tenn. Crim. App. Jan. 12, 2010)). However, we will uphold a court's revocation of probation despite the failure to make adequate findings if an independent and proper basis, aside from the Defendant's failure to pay, exists. See State v. Daryl McKinley Robinson, W1999-01386-CCA-R3-CD, 2000 WL 546209, at *2 (Tenn. Crim. App. May 4, 2000).

As for his violation of the community service requirement, the Defendant admits that one of the conditions of his probation was to perform community service work, but he argues that the record does not support revocation on this ground. He cites to Stacy Stewart v. State, No. M1999-00684-CCA-MR3-CD, 2000 WL 374756, at *2 (Tenn. Crim. App. Apr. 7, 2000), for the proposition that due process requires that probationers only be held responsible for violations of those conditions of probation of which they were reasonably apprised. Relying on this proposition, he submits that he "did not have notice that there was a deadline for him to complete a certain amount of community service hours by any other date than the natural expiration of his term of probation[,]" thus, that revocation is not supported by the record.

A review of the record establishes that the Defendant was on notice that, as a condition of his probation, he would have to complete a certain amount of community service within a specified timeframe. The conditions of probation, filed along with the Defendant's judgment form, reflected a requirement of "96 hours per year [c]ommunity [s]ervice through the Department of Correction[]." Prior to being transferred to enhanced probation, the Defendant had twice been informed through violation warrants of his failure to perform the

-9-

required amount of community service work. The Defendant acknowledged that he was informed by the court in December 2008 of his serious arrearage in this regard, but he agreed that he still had not completed the required amount. He estimated that he had done approximately four days of community service work since December 2008 and that he had approximately 14 days left to do. The Defendant admitted that he did not have a good reason for his non-compliance other than his transportation issues and employment search. The Defendant's sister testified that, if her schedule had permitted, she would have driven him to do community service work. We cannot conclude that the trial court abused its discretion in revoking the Defendant's probation on this ground.

The record supports the trial court's decision to revoke the Defendant's probationary sentence on the grounds that the Defendant committed new offenses and failed to perform his community service hours as required. The Defendant violated the conditions of his release after having been given a second chance. We have held "that an accused, already on probation, is not entitled to a second grant of probation or another form of alternative sentencing." State v. Jeffrey A. Warfield, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999), perm. app. denied, (Tenn. June 28, 1999). The trial court acted within its discretionary authority to revoke the Defendant's probation and impose his original six-year sentence. See Tenn. Code Ann. §§ 40-35-310, -311(e). Accordingly, the judgment of the trial court is affirmed.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE